IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 6, 2021

**STATE OF TENNESSEE v. LASHAWN SHANNON**

**Appeal from the Criminal Court for Shelby County**
No. 17-05054      **James M. Lammey, Judge**
_____

**No. W2020-00501-CCA-R3-CD**
_____

The Defendant, Lashawn Shannon, appeals his convictions for aggravated robbery and facilitation of aggravated kidnapping, for which he received an effective sentence of nine years' incarceration. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

W. Price Rudolph (on appeal), and John Dolan (at trial), Memphis, Tennessee, for the appellant, LaShawn Shannon.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jamie Kidd and Justin Prescott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The evidence presented at trial established that on the night of March 19, 2016, multiple people, including the Defendant, robbed and kidnapped the victim, Ms. Briana Smith, at gunpoint when the victim accompanied her cousin, Mr. Cameron Smith, to a drug transaction in the area of Orange Mound in Memphis, Tennessee. The victim escaped the perpetrators and reported the events to the police. The Defendant was charged with especially aggravated kidnapping and aggravated robbery of the victim as a

result of his role in the commission of the offenses. The Defendant was not charged with any offenses connected to the perpetrators' conduct against Mr. Smith.

At trial, the victim testified that on March 19, 2016, after she left work at 6:30 p.m., Mr. Smith called her and stated that he needed to "make a play" or sell someone marijuana. He offered to give the victim money for gas if she would drive him to the location of the drug transaction. The victim met Mr. Smith at their home between 7:00 and 7:30 p.m. and drove him to the Orange Mound area in Shelby County. The victim stopped in front of a house, and Mr. Smith exited the vehicle after instructing the victim to leave the vehicle in drive.

The victim testified that after looking down at her cell phone, she looked in the rear view mirror and saw two or three men holding Mr. Smith in a headlock and another man pointing a black gun at her. One of the men instructed the victim to exit the vehicle, a 2002 or 2003 Santa Fe Hyundai, and she complied. She stated that one of the men drove her vehicle to a nearby abandoned house, while the other men walked her and Mr. Smith to the abandoned house. Once they arrived, a man, whom the victim identified at trial as the Defendant, held a gun to her head and instructed her to lay her face down on the hood of the vehicle, and the victim complied. The victim stated that while her head was on the vehicle's hood, the men removed all of her belongings from the vehicle, including articles of clothing, her wallet, her purse, and her cell phone, and took them to a shed located behind the abandoned house. The victim said that the men did not have her permission to take the items and that she did not feel free to leave because the Defendant was pointing a gun at her while the men removed the items.

The victim testified that some of the men walked Mr. Smith toward the shed and then returned with Mr. Smith, holding him at gunpoint. The men forced the victim and Mr. Smith back into the vehicle and demanded that Mr. Smith tell them the location of Mr. Lee Fifer and "the money." Mr. Smith told the men that he did not know where Mr. Fifer or "the money" was located. The victim convinced the men that she could take them to Mr. Fifer. The men removed Mr. Smith from the vehicle and walked him back to the shed. They moved the victim to the front passenger seat of the vehicle and instructed her to provide the directions to Mr. Fifer's location.

The victim stated that while they were at the abandoned house, a woman arrived and joined the men. The woman drove the vehicle; the Defendant, who was armed, sat behind the driver; and another man, to whom the victim referred as "the ring leader," sat behind the victim. They first drove to the home of Mr. Fifer's mother. The victim and the woman exited the vehicle and approached the door, and the victim knocked. Mr. Fifer's mother came to the door but did not know where Mr. Fifer was. The victim said,

"I was trying to make a gesture for help, but I didn't want anybody else harmed." She explained that she needed help because she was being held against her will.

The victim testified that she attempted to stall the perpetrators and told them that she knew where Mr. Fifer's sister lived. The victim directed the perpetrators to the apartment of Mr. Fifer's sister. The victim and the driver exited the vehicle and approached the door, and the victim knocked. Mr. Fifer's sister came to the door but did not know where Mr. Fifer was. Once the victim and the driver returned to the vehicle, the perpetrators searched through Mr. Smith's cell phone and called someone whom they knew was connected to Mr. Fifer. However, they were not able to determine Mr. Fifer's location. The perpetrators then began driving back toward the abandoned house.

The victim stated that at one point, they saw several police cars, which made the perpetrators nervous. The victim's aunt then called the victim's cell phone, and the victim convinced the perpetrators to allow her to speak to her aunt in order to ensure her that nothing was wrong. The victim stated that her aunt knew that something was wrong and continued to ask her where she was. The victim told her aunt that nothing was wrong and ended the call.

The victim testified that the "ring leader" received a call and that she could hear the person on the other end of the call yelling that Mr. Smith had escaped. The victim stated that the mood inside the vehicle was "tense" and that one of the men turned up the music to prevent the victim from hearing the perpetrators' conversation. The "ring leader" told the driver that they were going to drop her off somewhere because he was planning to hurt the victim. He instructed the driver to drive across the nearby parking lot of a gas station. When the driver did so, the victim jumped out of the vehicle. The victim agreed that she jumped out of the vehicle because she was being held against her will and was in fear of her life. She said that even though the perpetrators told her that the incident did not have anything "to do with [her]," the perpetrators were not wearing masks in an attempt to hide their identities. The victim fell on her right side while jumping out of the vehicle and was scratched, swollen, and bruised as a result. She ran into a nearby restaurant and asked for help while the perpetrators drove away in her vehicle. An older couple allowed the victim to get into the back seat of their car and use their cell phone to call her aunt.

The victim testified that her aunt came to the restaurant and then left to search for Mr. Smith, who was running down the street while nude because the perpetrators had stripped him of his clothes. The victim believed her aunt called the police. Detectives transported the victim to the police station, and she provided them with a statement. Three days after the offense, the victim met with an officer and viewed multiple photographic lineups. The victim identified the Defendant in one of the photographic

lineups and wrote, "His role in this crime was to follow the orders of the suspect calling the shots. He forced me into the car, took my identification, and had a gun. He told me to put my car in park and cut the engine off. He also drove my car down to the abandoned home where we were taken."

The victim identified photographs of articles of her clothing, her purse, her wallet, and Mr. Smith's house shoes. She said that the clothing was in the vehicle's trunk and that her purse and her wallet were in the front seat. She did not believe the Defendant moved any of the items but stated that he pointed a gun at her while others removed the items. The men did not have her permission to place the items into the shed.

On cross-examination, the victim testified that she had never seen the Defendant prior to the night of the incident. She stated that she was able to identify the Defendant because she looked at his face while he was pointing a gun at her and he was not wearing a mask. She also stated that while the Defendant was not the "ring leader" or the "shot caller," the Defendant "played his part." The victim explained that after she was ordered to exit her vehicle, the Defendant drove the vehicle to the abandoned house. The man who was "calling the shots" walked the victim to the abandoned house with his arm around the victim's neck. The man told the victim that he knew she was not involved and that he was looking for Mr. Smith and Mr. Fifer because they had "f***ed him out of a whole lot of money." The victim later learned that the men were angry about pills that Mr. Smith and Mr. Fifer had sold them. The victim stated that when she arrived at the abandoned house, the Defendant pointed a gun at her and instructed her to raise her hands and to lay her head on the hood of the vehicle.

The victim testified that both the Defendant and the man who was "calling the shots" were in possession of guns while they were riding around in the victim's vehicle searching for Mr. Fifer. They also had both the victim's cell phone and Mr. Smith's cell phone. The victim stated that the woman who drove the vehicle had a gun pointed at the victim while they were standing at the front door of the home of Mr. Fifer's mother. The victim explained that she did not ask Mr. Fifer's mother for help because the victim did not want to endanger her.

On redirect examination, the victim testified that she believed she was going to die. She stated that when she offered to direct the perpetrators to the home of Mr. Fifer's mother, she was only stalling while she tried to determine how to get out of the situation. When they arrived at the home, one of the men passed his gun to the driver. The victim did not feel free to leave. After the man who was directing the others learned that Mr. Smith had escaped, he said they were going to kill the victim.

Mr. Cameron Smith, the victim's cousin, testified that on March 19, 2016, the victim drove him to the Orange Mound area in order for him "to go handle something" and that he "ended up getting into a little predicament with some guys." Mr. Smith acknowledged that he was "probably selling some narcotics" for Mr. Fifer, who was incarcerated at that time. When they arrived, Mr. Smith exited the vehicle and walked away from the vehicle to speak to a man. The man pointed a gun at him, and Mr. Smith looked back and saw two more men with guns. One man instructed another man to drive the vehicle down the street. The other two men walked Mr. Smith and the victim down the street at gunpoint to an abandoned house. Mr. Smith said that once they arrived at the abandoned house, the men placed him in the back seat of the car and demanded to know Mr. Fifer's location, but Mr. Smith did not know where Mr. Fifer was at that time. Mr. Smith stated that the victim was sitting in the driver's seat and that the men did not make her exit the vehicle.

Mr. Smith recalled that one of the men was "calling all the shots" and telling the other two men what to do. The leader of the group stated that they were going to search for Mr. Fifer and would kill Mr. Smith if they were unable to locate Mr. Fifer. One of the men took Mr. Smith out of the car, walked him to a shed, and struck him on the head with a gun, which Mr. Smith described as a .410 caliber revolver. Mr. Smith recalled that one of the other men had a .38 special firearm and that a third man had a "Glock," which he pointed at the victim. The man who was in the shed with Mr. Smith instructed Mr. Smith to remove his clothes, and Mr. Smith complied and lay down on the floor. Mr. Smith stated that the man was recording video on his cell phone and "talking crazy." Mr. Smith believed he remained in the shed for "a couple of hours."

Mr. Smith testified that he was unable to see the face of the man who was in the shed with him because the man was wearing a hoodie. The man told Mr. Smith that he planned to kill Mr. Smith at 9:00 p.m. As the time approached 9:00 p.m., the man asked, "Well, you know what time it is, right?" The man walked out of the shed and closed the door, leaving Mr. Smith alone. Mr. Smith got up and ran out through the back door. The man also ran out and threatened to shoot Mr. Smith, but Mr. Smith continued to run. Mr. Smith jumped over a fence and saw some people parked in a car using their cell phones. He knocked on the car door, told them that he had been kidnapped and that someone had tried to kill him, and asked for help. The people allowed Mr. Smith to get into the backseat, and Mr. Smith told them to drive away. They drove to the parking lot of an Autozone, where a woman in the car gave Mr. Smith clothing to wear and allowed him to use her cell phone to call the police. Mr. Smith testified that an officer, who was across the street, responded, and Mr. Smith told the officer what had occurred. The officer drove Mr. Smith to the abandoned house, where Mr. Smith retrieved his belongings.

Memphis Police Officer Jonathan Sharman testified that on March 19, 2016, he was in the area of an Autozone when he saw a woman waving her arms. Officer Sharman drove into the parking lot. The woman advised him that a man, whom Officer Sharman identified as Mr. Smith, jumped in the back seat of her car while naked and that she had given Mr. Smith clothes to wear. Officer Sharman spoke to Mr. Smith and requested assistance from other officers. Meanwhile, Memphis Police Officer Kevin Tharpe and his partner were flagged down by the victim while they were patrolling the area. Officers interviewed both the victim and Mr. Smith. Officers also went to the abandoned house where they located a dark blue purse, a wallet, a duffle bag, and a black house shoe inside of a shed.

The victim's vehicle was recovered by officers less than one-half of a mile from where the victim jumped out of the vehicle. The vehicle was towed from the area in order to be processed by law enforcement. The Defendant's fingerprints were on the interior door handle on the left rear passenger side and on the outer window trim on the driver's side door.

Once Memphis Detective Brandon Hudson received information about fingerprints located on the vehicle, he prepared multiple photographic lineups, which he showed to the victim on March 22, 2016. He testified that the victim identified the Defendant in one of the photographic lineups. The victim was unable to identify another suspect in a second photographic lineup.

The jury convicted the Defendant of aggravated robbery and facilitation of aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping. Following a sentencing hearing, the trial court sentenced the Defendant to concurrent terms of nine years for aggravated robbery and three years for facilitation of aggravated kidnapping. The Defendant filed a motion for new trial, which the trial court denied following a hearing.

## ANALYSIS

The Defendant contends that the evidence is insufficient to support his convictions. He challenges his aggravated robbery conviction, asserting that the evidence fails to establish that he intentionally or knowingly participated in the theft of the victim's property and that his aggravated robbery conviction is inconsistent with the jury's verdict acquitting him of especially aggravated kidnapping and aggravated kidnapping. The Defendant challenges his conviction for facilitation of aggravated kidnapping on the basis that the kidnapping was incidental to the robbery. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. Aggravated Robbery

As related to the present case, aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably relieve it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a).

The trial court instructed the jury on criminal responsibility for the conduct of another. A person may be charged with the commission of an offense committed "by the conduct of another for which the person is criminally responsible." T.C.A. § 39-11-401. "Criminal responsibility is not a separate crime, but 'a theory by which the State may prove the defendant's guilt of the alleged offense … based upon the conduct of another person.'" *State v. Dickson*, 413 S.W.3d 735, 744 (Tenn. 2013) (quoting *State v. Lemacks*,

996 S.W.2d 166, 170 (Tenn. 1999)). As the trial court instructed the jury, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempt to aid another person to commit the offense." T.C.A. § 39-11-402(2). Although "no specific act or deed need be demonstrated …, the evidence must establish that the defendant in some way knowingly or voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (internal citations omitted).

The items listed in the indictment that were taken from the victim as a basis for aggravated robbery were the victim's purse and its contents, her cell phone, and her vehicle. The evidence, when viewed in the light most favorable to the State, established that the victim and Mr. Smith went to a home believing that someone was planning to purchase drugs from Mr. Smith. When Mr. Smith exited the victim's vehicle, three men, including the Defendant, approached him with guns. One of the men pointed a gun at the victim and ordered her to exit her vehicle. The Defendant entered the victim's vehicle and drove it to an abandoned house, exercising control over the vehicle without the victim's permission, while the other two men walked Mr. Smith and the victim to the abandoned house. Once they arrived, the Defendant pointed a gun at the victim and instructed her to lay her face on the hood of her vehicle. The Defendant held the victim at gunpoint while the other men removed the victim's belongings from the vehicle and placed them inside the shed. We conclude that this evidence is sufficient to support the Defendant's conviction for aggravated robbery either as the principal offender or under a theory of criminal responsibility.

The Defendant maintains that the jury's verdict of guilt for aggravated robbery is inconsistent with its verdict of acquittal of the original charge of especially aggravated kidnapping and lesser-included offense of aggravated kidnapping. He asserts that through its acquittal, the jury found that he did not use a deadly weapon or an object fashioned as a deadly weapon. He argues that as a result, he "could not have used a deadly weapon or object fashioned as a deadly weapon during the robbery" and that his conviction for aggravated robbery cannot stand.

We need not determine whether the verdicts are inconsistent as our supreme court has recognized that "inconsistent jury verdicts are not a basis for relief." *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015). The court reasoned that "'[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" *Id.* (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)). "Inconsistent verdicts on multiple charges against a single defendant may take the form of an inconsistency between a conviction and an acquittal." *Id.* at 72. So

long as the appellate court determines that the evidence established guilt on the offense of which the accused is convicted, inconsistent verdicts may stand. *Id.* at 76. We have determined that the evidence is sufficient to support the Defendant's conviction for aggravated robbery, and as we state below, the evidence is also sufficient to support the Defendant's conviction for facilitation of aggravated kidnapping. Therefore, the Defendant is not entitled to relief regarding this issue.

### B. Facilitation of Aggravated Kidnapping

As related to the present case, aggravated kidnapping is defined as false imprisonment "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(a)(5). "A person commits false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility …, the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a).

The Defendant does not challenge the sufficiency of the evidence as it relates to the statutory elements of facilitation of aggravated robbery. Rather, he asserts that the kidnapping was incidental to the aggravated robbery and that, as a result, a separate kidnapping conviction is prohibited.

In *State v. White*, 362 S.W.3d 559, 562 (Tenn. 2012), the Tennessee Supreme Court held that "the legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony." When a defendant is charged is a kidnapping offense and an accompanying felony, the removal or confinement must have "criminal significance above and beyond that necessary to consummate some underlying offense." *White*, 362 S.W.3d at 577. The trial court must instruct the jury to determine whether the removal or confinement was essentially incidental to the accompany felony or whether it was sufficiently significant, standing along, to support a conviction for kidnapping. *Id.* at 578.

The Tennessee Supreme court set out the following list of non-exclusive factors to consider in determining whether the State proved that the defendant's removal or confinement of a victim "was to a greater degree than that necessary to commit" the accompanying felony: (1) "the nature and duration of the victim's removal or confinement by the defendant"; (2) "whether the removal or confinement occurred during the commission of the separate offense"; (3) "whether the interference with the victim's liberty was inherent in the nature of the separate offense"; (4) "whether the removal or

confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so"; (5) "whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective"; and (6) "whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." *Id.* at 580-81.

The Defendant acknowledges that the trial court properly instructed the jury as required by *White*, and we agree that the jury was properly instructed. Accordingly, the jury's determination that the removal or confinement of the victim is beyond what was necessary to consummate the offense of aggravated robbery of the victim involves a question of fact, which this court will not disturb on appeal so long as there is sufficient evidence to sustain the convictions. *See id.* at 579; *State v. Donald Lee Shields, Jr.*, No. M2019-00344-CCA-R3-CD, 2019 WL 6049019, at *11 (Tenn. Crim. App. Nov. 15, 2019), *perm. app. denied* (Tenn. Apr. 15, 2020); *State v. Christopher Lee Williams*, No. M2016-00568-CCA-R3-CD, 2017 WL 1063480, at *5 (Tenn. Crim. App. Mar. 21, 2017).

The record reflects that the duration of the victim's confinement was longer than necessary to commit the aggravated robbery. The Defendant and the other perpetrators did not release the victim after taking her vehicle and her belongings at gunpoint. Rather, they placed the victim and Mr. Smith back inside the vehicle and demanded to know the location of Mr. Fifer and "the money." Contrary to the Defendant's claim on appeal, the evidence does not reflect that the victim "willingly" offered to "help" the perpetrators locate Mr. Fifer. Rather, Mr. Smith testified that the perpetrators threatened to kill them if they were unable to locate Mr. Fifer, and the victim testified that she only told the perpetrators that she knew where to locate Mr. Fifer in order to stall the perpetrators. They forced the victim into her vehicle, were armed, and demanded that she provide them with directions. They drove around with the victim inside the vehicle for a period of time and went to multiple locations. One of the perpetrators held the victim at gunpoint when the victim approached the residences to prevent her from summoning assistance. The continued confinement also reduced the risk of detecting the Defendant and the other perpetrators and increased the victim's risk of harm. One of the perpetrators threatened to kill the victim, and the victim managed to escape before he carried out his plan. We conclude that there is sufficient evidence from which the jury could conclude that the victim's removal and confinement had criminal significance beyond that necessary to consummate the aggravated robbery. Accordingly, the evidence is sufficient to support the Defendant's conviction for facilitation of aggravated kidnapping.

**CONCLUSION**

We conclude that the evidence is sufficient to support the Defendant's convictions, and we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE